UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                 Case No.  17-20523
vs.                             HON.  GEORGE CARAM STEEH

DMARIO DWAYNE CANNON,

        Defendant.
_____/

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE, (DOC. 21), MOTION FOR A FRANKS HEARING, (DOC. 22),
AND MOTION TO SUPPRESS STATEMENTS, (DOC. 23)

Defendant Dmario Dwayne Cannon is charged with being a felon in

possession of a firearm in violation of 19 U.S.C. § 922(g). This matter is

presently before the Court on Cannon's Motion to Suppress Evidence

under the Fourth Amendment, (Doc. 21), Motion for a *Franks* Hearing,

(Doc. 22), and Motion to Suppress Statements under the Fifth Amendment,

(Doc. 23). Oral argument was held on October 19, 2017. For the reasons

stated below, Cannon's motions are DENIED.

**I. Background**

Cannon lived in Apartment 101 of the Newport Apartments on Lotus

Street in Clinton Township, MI, with his girlfriend, his daughter, and three

year old stepson. On June 20, 2017, Cannon's stepson shot himself while

playing with other children outside the Newport Apartment complex. He died shortly thereafter at McLaren Hospital.

Witnesses reported the shooting to 911 around 1:00pm. (Doc. 23-9). They stated that a child shot himself and was being rushed to the hospital. (*Id.*). They could not locate the gun. (*Id.*).

Clinton Township Police Department (CTPD) officers responded by to McLaren Hospital and the Newport Apartment complex around 1:00pm. Officers at McLaren Hospital interviewed the child's family. Cannon stated that he was asleep inside the apartment and woke to his girlfriend screaming that their child had been shot. (Doc. 29-2 at PageID 221). She entered their apartment and Cannon saw a neighbor holding the child by the front door. (Doc. 29-2 at PageID 221). Cannon got dressed and drove them to the hospital. (Doc. 29-2 at PageID 221).

Officers at the apartment complex interviewed multiple witnesses. Some indicated that the child was carried to Apartment 101, where he lived with his family, before departing for the hospital. (Doc. 22-3 at PageID 96). Witnesses did not know if anyone else had been injured. (*Id.*). They also reported that the child may have shot himself with a gun belonging to Lamonte Odell Johnson, also known as "Bop." One witness reported that Johnson probably took the gun after the shooting. Johnson was arrested

around 7:45pm that evening. (Doc. 21-4 at PageID 69). Johnson stated that he saw the injured child, panicked, and fled. (Doc. 22-5 at PageID 104). He asserted that he did not have a gun. (*Id.*).

Officers observed a blood trail progressing from the front of the apartment complex to Cannon's building. (*Id.*; Doc. 22-4 at PageID 100). There was a small blood smear in the center of the front door of Apartment 101. (Doc. 22-4 at PageID 100). Officers entered the apartment to search for injured parties. Officer Christopher Smith entered first after finding that apartment door open. (Doc. 22-3 at PageID 96). Officer Michael Vasilovski and Sergeant Coppola later performed a secondary sweep. (Doc. 22-4 at PageID 100). Both searches were negative.

Detective J. Hertel allegedly arrived at the apartment complex 15-20 minutes after the shooting. About a dozen officers were already on the scene. Sergeant Coppola updated Hertel on the investigation and stated that a warrant was needed to search the child's apartment. Approximately 15-20 minutes after arriving on the scene, Hertel purportedly returned to the police station to prepare the warrant and affidavit. (Doc. 21-2).

The affidavit was faxed to a Macomb County magistrate judge around 3:05pm on June 20, 2017. The affidavit states the place to be searched as

the entire contents of XXXX Lotus, Apartment 101 in the Newport

Apartment complex. (Doc. 21-2 at PageID 64).

The property searched for is specifically described as "any firearms,

firearm ammunition, spent firearm ammunition, blood, fibers, clothing, any

and all evidence of a firearm shooting / death investigation. Any and all cell

phones and contents within the cell phones. Any and all computers and

contents within the computers." (Doc. 21-2 at PageID 64).

The section listing "facts establishing probable cause" includes nine

short paragraphs. (Doc. 21-2 at PageID 64). The first eight paragraphs

discuss Detective Hertel's training and experience.   He was hired as a

CTPD officer in 1996 and promoted to detective in 2010. He was involved

with numerous investigations including crimes against children, shots fired,

and homicide/death. He had over 800 hours of advanced police training

courses as well as an Associate Degree in Law Enforcement, a Bachelor's

Degree in Criminal Justice, and a Master's Degree in Administration.

The ninth paragraph summarizes the investigation. (Doc. 21-2 at

PageID 65).

> Affiant was called to assist in the investigation of a
> shooting / death investigation (Clinton Township
> Police report number 17-23545). It was reported to
> the Clinton Township Police Department that
> [redacted] (date of birth XX/2014) was playing in the

area in front of [redacted] Lotus with other children. [Redacted] lives at [redacted] Lotus, Apartment [redacted] with his parents. [Redacted] (three years old) was apparently shot in the chest with an unknown firearm. Calls to dispatch reported that the child may have possibly shot himself with a silver revolver with wooden grips. After being shot, [redacted] may have been taken back to [redacted] Lotus, apartment [redacted] before going to the hospital. [Redacted] was transported to McLaren Hospital by his parents where he has been pronounced dead. Officers have not been able to recover a firearm at this time.

(Doc. 21-2 at PageID 65).

The magistrate judge signed the search warrant and listed the date and time as June 22, 2017, 3:35pm. The parties agree that the date is incorrect – it was actually signed on June 20, 2017.

Officers searched Cannon's apartment on the afternoon of June 20, 2017. They found a Kimber .45 caliber pistol loaded with seven rounds, a bag of marijuana, scales, a black ski mask, a Blue Cross insurance card belonging to Cannon, and court papers belonging to Cannon. This firearm was not the weapon used by the deceased child. Officers purportedly still have not located that gun.

A criminal complaint was filed on July 19, 2017. Cannon was arrested on July 20, 2017. Two officers, Agents Herrara and CTPD Detective Gilbert, interrogated Cannon. The officers stated that Cannon was being

charged as a felon in possession of a firearm. The officers read Cannon his *Miranda* rights. Cannon stated that he understood his rights. Officers then discussed a waiver, noting that, even after signing a waiver, Cannon could stop talking at any point.

Officers then discussed Cannon's options. First, they could book Cannon at that moment. Officers advised that Cannon would likely be detained, then indicted. They confirmed that this was Cannon's first federal case and stated that he would face mandatory minimums. Cannon asked if this meant a maximum of five years. (Doc. 30-3 at PageID 279). The officers clarified that only state charges used that approached. Agent Herrara stated that federal cases had a mandatory minimum of five years and that there is no parole in the federal system. Cannon said he did not want to go to jail for five years, mentioning his girlfriend and surviving child. Detective Gilbert noted his familiarity with Cannon's stepson's case.

Gilbert addressed Cannon's second option. Gilbert stated that if Cannon cooperated, the officers could speak with federal prosecutors and possibly help him with his felon in possession charge. The parties discussed what cooperating entailed. After additional discussion, Cannon signed the waiver. Officers confirmed that Cannon had read his waiver. This exchange took about 20 minutes.

Cannon thereafter confessed to possessing the gun found in his apartment on June 20, 2017. Officers ended the interview after 51 minutes. The Government asserts that their discussions did not constitute cooperation or yield worthwhile information.

## II. Motion to Suppress Evidence

### A. Legal Standard

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause requires a "fair probability," given the totality of the circumstances, "that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The affidavit supporting the search warrant must demonstrate a specific and concrete nexus between the evidence sought and the place to be searched. *United States v. Carpenter*, 360 F.3d 591, 594-95 (6th Cir. 2004) (en banc). Reviewing courts must give the determination of the issuing magistrate "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

**B. Analysis**

Cannon argues that the affidavit does not include facts demonstrating a nexus between evidence of the child's shooting and Apartment 101. First, Cannon asserts that the affidavit merely contains boilerplate language about the officer's training and experience. An officer's training and experience alone will not provide the data necessary to support a conclusion that evidence is likely to be found in a particular place. *See United States v. Schultz*, 14 F.3d 1093 (6th Cir. 1994). Here, however, information regarding Officer Hertel's training and experience was accompanied by facts suggesting that evidence of the child's shooting would be found in Apartment 101. The affidavit states that the child lived in Apartment 101, was shot in the chest with an unknown firearm outside the apartment complex, and, after the shooting, may have been taken back to Apartment 101 before going to the hospital. Finally, the affidavit noted that officers had not recovered the firearm. The warrant application sought evidence of the shooting, including blood, clothing, fibers, and firearms.

Under these circumstances, there was probable cause to believe that this evidence would be found in Apartment 101. The child lived in Apartment 101 and reportedly returned there after the shooting. Furthermore, whoever picked up the child may have also picked up the

gun; perhaps to keep it away from the other children. It is not clear whether Hertel was aware of the additional information about the firearm and its suspected owner, Johnson. But, even if Hertel was aware, officers did not know, with certainty, that Johnson owned the gun and collected it after the child's shooting such that all threats were resolved. The officers' failure to follow other possible leads could have resulted in the loss of evidence or further injury from the missing firearm. There is, therefore, a fair probability that evidence, including blood, fibers and the missing firearm, would be found in the apartment.

Cannon counters that this conclusion only arises after making an untenable inference that the child actually entered Apartment 101. The affidavit states that "after being shot," the child "may have been taken back" to Apartment 101 "before going to the hospital."(Doc. 28-1 at PageID 191). Cannon's emphasis on this argument may arise from witness statements, including his own, indicating that the child did not enter the apartment after the shooting. Instead, a family friend picked up the child and, alongside his mother, carried him to Apartment 101. The child's mother entered the apartment to notify Cannon, but the friend holding the child remained at the apartment door and never entered the threshold. While these facts are not included within the four corners of the affidavit, they do not undermine a

finding of probable cause. The affidavit does not assert that the child

actually entered the apartment. It merely states that he may have been

taken there after the shooting. While conditional, the magistrate could

consider this information in light of "all of the circumstances set forth in the

affidavit before him," including the fact that the child lived in Apartment 101

with his parents, who transported him to the hospital after the shooting.

*United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (internal

quotations omitted). Under these circumstances, the Court cannot find that

the magistrate made an untenable inference rather than undertaking a

"practical, common sense evaluation" of these circumstances and

concluding that there was a fair probability that evidence of the child's

shooting would be found in Apartment 101. *Id.*

    Finally, Cannon relies on *United States v. West*, 520 F.3d 604 (6th

Cir. 2008), to argue that the information in the affidavit is unreliable

because Hertel did not identify his basis of knowledge. In *West*, the court

ruled that an affidavit was "bare bones" and did not establish probable

cause. *Id.* at 610. The affidavit stated that the defendant was the last

person to have contact with the missing victim, had been convicted and

served time for murder and attempted murder, and, according to unknown

sources, dealt marijuana. *Id.* None of these allegations were supported by

facts. *Id.* The murder and attempted murder convictions were patently false. *Id.* The affiant's statements relied on hearsay and failed to include information about the source's veracity, reliability, and basis of knowledge. *Id.*

This case is distinguishable from *West* because Hertel provided a basis for his factual statements and did not make any false statements. Hertel refers to one basis of knowledge, calls to dispatch, when stating the fact that the child reportedly shot himself with a silver revolver with wooden grips. No other sources are referenced and Hertel does not explicitly refer to these 911 calls to support the additional facts in the affidavit. Here, however, it is reasonable to infer that the additional information was reported by witnesses at the scene either through calls to dispatch or interviews at the scene. Further, unlike *West*, this information was not false. Dispatch records and witness statements, including those of Cannon and his girlfriend, verify that the child lived in Apartment 101, was shot outside the apartment complex, carried to Apartment 101, and then transported to the hospital.

For the reasons stated above, the Court concludes that the search warrant was not defective. Cannon's Motion to Suppress Evidence, (Doc. 21), is DENIED.

### III. Motion for a Franks Hearing

**A. Legal Standard**

*Franks v. Delaware*, 438 U.S. 154 (1978) recognizes a defendant's "right to challenge the sufficiency of an executed search warrant by attacking the veracity of the affidavit supporting the warrant." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008). *Franks* "granted defendants a limited right to an evidentiary hearing concerning the veracity of the affidavit." *Id.*

> In the case of alleged material omissions—by analogy to the standard for *included* false statements—the defendant is entitled to a hearing if and only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit, and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it.

*Id.* "There is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement." *Id.* (internal citations omitted).

**B. Analysis**

Cannon argues that Officer Hertel, the affiant, engaged in deliberate falsehood or reckless disregard for the truth in omitting the following facts from the affidavit:

- CTPD officers previously entered Apartment 101 without a warrant on two occasions and did not find any evidence in plain view,
- The child did not enter Apartment 101 after the shooting, and
- Evidence indicated that Johnson owned the gun and ran off with it after the shooting.

Cannon does not offer any facts that support the conclusion that Hertel knew this information when he submitted the affidavit. Although both parties submitted a substantial evidence, the timeline of the CTPD's investigation is not completely clear.

Calls to dispatch reported the shooting around 1:00pm. Several CTPD officers arrived at the scene shortly thereafter. Smith seems to have been one of the first responders. He entered Apartment 101 without a warrant to search for injured parties. Coppola and Vasilovski thereafter purportedly conducted a second sweep of the apartment to check for additional victims. (Doc. 22-4) at PageID 100).

Hertel arrived 15-20 minutes after the shooting. Coppola allegedly updated Hertel on the investigation and stated that a search warrant was needed to search Apartment 101. Hertel purportedly spent 15-20 minutes at the scene before returning to the police station to prepare the warrant application.

Cannon does not provide evidence that proves Hertel spoke with Smith, Coppola, Vasilovski, or anyone else regarding the contested facts.

Cannon argues, however, that, even if Hertel did not know this information, knowledge of these facts is imputed to him under the collective knowledge doctrine.

The collective knowledge doctrine originated from discussions of *Terry* stops and arrests. It "recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). Sixth Circuit precedent suggests that the doctrine does not apply here. In *United States v. Duval*, 742 F.3d 246 (6th Cir. 2014), the defendants argued that a search warrant was invalid because the affiant made deliberate material omissions in order to obtain the warrant. *Id.* at 250. The court found that the affiant did not know the contested information, and therefore, "his failure to include that information could not have been deliberate." *Id.* at 253. The defendants, however, "attempt[ed] to impute the collective knowledge of other [officers] to [the affiant]." *Id.* (internal quotations omitted). The court reviewed precedent governing the collective knowledge doctrine and concluded that it did not apply because there was "no evidence" that the other officers on the affiant's investigative team communicated with the affiant, "either directly or indirectly," about the allegedly deliberately omitted information.

*Id. See also United States v. Johnson*, No. 5:16-CR-44-DCR-REW, 2016 WL 3693327, at *8, n.17 (E.D. Ky., June 30, 2016) (discussing *Duval*, stating that the court rejected "an effort to apply the doctrine as a sword for the defense in attacking a warrant under *Franks*.").

Like *Duvall*, Cannon does not provide evidence that other officers communicated with Hertel, directly or indirectly, about the allegedly omitted information. Furthermore, Hertel was not present for the two warrantless entries of Apartment 101 nor the witness interviews that discussed evidence against Johnson and whether the child actually entered the apartment. Thus, as in *Duvall*, the collective knowledge doctrine does not apply in this case. Hertel did not know the allegedly omitted facts, and therefore, his failure to include them in the affidavit is not deliberate nor does it constitute reckless disregard for the truth. *Id.* at 253. Cannon has failed to make the requisite substantial preliminary showing and is not entitled to a hearing. *Fowler*, 535 F.3d at 415. For these reasons, his Motion for a *Franks* Hearing, (Doc. 22), is DENIED.

## IV. Motion to Suppress Statements

### A. Legal Standard

The Government bears a heavy burden to demonstrate that a defendant knowingly and intelligently waived their privilege against self-

incrimination and their right to retained or appointed counsel. *Miranda v.*

*Arizona*, 384 U.S. 436, 475 (1966). Waiver must be voluntary; the product

of a free and deliberate choice rather than intimidation, coercion, or

deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The Government

must prove waiver by a preponderance of the evidence. *Colorado v.*

*Connelly*, 479 U.S. 157, 168 (1986). In determining whether a confession is

involuntary due to police coercion, the Sixth Circuit assesses whether "(i)

the police activity was objectively coercive; (ii) the coercion in question was

sufficient to overbear the defendant's will; (iii) and the alleged police

misconduct was the crucial motivating factor in the defendant's decision to

offer the statements." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir.

2016).

**B. Analysis**

Cannon argues that the officers' activity was objectively coercive

because officers led a custodial interrogation, made coercive promises of

leniency, and exploited his vulnerability as a grieving father.

Cannon argues that his case parallels *United States v. Siler*, 526 F.

App'x 573 (6th Cir. 2013). In *Siler*, the defendant was arrested for a

probation violation. *Id.* at 573. Officers asked to speak to him about a series

of burglaries. *Id.* The defendant waived his *Miranda* rights. *Id.* The officer

misrepresented evidence, stating that he had a "pretty good case" against the defendant for two burglaries. *Id.* The officer stated that if the defendant helped locate a gun used in the burglary, the officer would speak with the district attorney and try to get the defendant into drug rehabilitation. *Id.* The officer discussed the defendant's past convictions and the impact his criminal history would have on burglary charges. *Id.* The officer stated that he had clout with the district attorney, *id.*, and while he could not promise the defendant anything, he was responsible for typing warrants, which determined whether the defendant would be charged or sent to rehabilitation. *Id.* at 574. The officer repeated that he would write the warrants for the burglaries and the defendant's background would mean jail time. *Id.* The defendant asked what would happen if he talked about the gun. *Id.* The officer said that if they got the gun, they would tell probation that the defendant was cooperating and was a good candidate for probation. *Id.* The officer had a stack of papers purportedly representing 30 investigations against the defendant. *Id.* The officer said that if the defendant gave up the gun, he would throw out those investigations and, because he typed the warrants, ensure that the defendant was not charged with a crime related to that gun. *Id.* The officer further clarified that no one would be charged regarding that gun. *Id.*

The court ruled that the officer's behavior was objectively coercive. *Id.* at 575. Offers of leniency were recognized as coercive because they were illusory and promised lenient treatment that was quite unlikely. *Id.* at 575-76. The officer's statements were also legally inaccurate because the officer did not have authority to bind prosecutors. *Id.* at 576.

Cannon argues that the officers made similarly coercive statements and improper promises of leniency. He asserts that officers offered his immediate release, the complaint's dismissal, and that waiver was the only way to return home that evening. Cannon continues that the officers lied about the punishment he faced – pointing to their false statements about a 5 year mandatory minimum – and that the promise was illusory because the Government pressed for detention even though he waived his rights.

The Government responds that *Siler* is distinguishable. Officers did not promise that waiver or cooperation would ensure that no one would be charged for possessing the gun found in Apartment 101. They did not mispresent that they could choose whether to prosecute. They merely offered to advocate on Cannon's behalf if he cooperated. The Government asserts that these statements are not illusory promises because this reward was based on Cannon cooperating with officers to provide useful information regarding neighborhood drug deals, not on waiving his rights. It

asserts that it sought detention because Cannon did not provide significant information.

The Government further argues that this case resembles *Binford*. There, officers promised to help the defendant with charges if he cooperated; a promise they had authority to make. 818 F.3d at 272. The court found, therefore, that it was not an illusory promise. *Id.* at 271-72. Further, there was no evidence that it had been broken. *Id.* at 272. The court also compared the case to *Siler* and found that the officer's promise did not approach that level of coercion. *Id.*

Finally, the Government asserts that interrogation was not objectively coercive. The officers were calm, sympathetic, and straight forward. They did not yell, physically harm or threaten Cannon, or use any deprivation tactics. They repeatedly stated that if he waived his rights, he could choose to stop talking whenever he wished. They promised not to disclose Cannon's cooperation and expressed sympathy for the loss of his step son.

The court concludes that the officers' conduct was not objectively coercive. Promises of leniency in exchange for cooperation are usually permissible. *Bindford*, 828 F.3d at 271. Such promises are only objectively coercive if they are broken or illusory. *Id.* Here, as in *Binford*, the officers' promise "was not an illusory promise because it actually committed [the

officers] to undertake a specific course of action in return for [Cannon's] cooperation." *Id.* at 272. They did not promise anything outside the scope of their authority nor promise that no one would be charged for the possessing the gun. Finally, Cannon's reliance on *Siler* is unavailing because the officers' conduct here does not approach the level of coercion in *Siler*.

For the reasons stated above, Cannon's Motion to Suppress Statements, (Doc. 23), is DENIED.

## V. Conclusion

For the reasons stated above, Cannon's motions (Doc. 21, 22, 23) are DENIED.

IT IS SO ORDERED.

Dated: December 7, 2017

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 7, 2017, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk